# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| TROY D. HOLT, | ) | |
| | ) | |
| PLAINTIFF, | ) | No. 3:12-00445 |
| | ) | Judge Nixon/Brown |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| COMMISSIONER OF THE SOCIAL | ) | |
| SECURITY ADMINISTRATION | ) | |
| | ) | |
| DEFENDANT. | ) | |

**To: The Honorable Judge John T. Nixon, Senior United States District Judge**

## CORRECTED REPORT AND RECOMMENDATION

For the reasons explained herein, the Magistrate Judge **RECOMMENDS** that the plaintiff's motion for judgment on the administrative record (the record) be **DENIED**, and the Commissioner's decision be **AFFIRMED**.

### I.        Procedural History

The plaintiff protectively filed for Disability Insurance Benefits (DIB) on April 07, 2009 (DE 12, pp. 123-24; 129).[1] He claimed an onset date of March 17, 2008 (DE 12, p. 123). The plaintiff claimed disability due to back problems and numbness in his left leg (DE 12, p. 133). On June 16, 2009, the Commissioner denied the DIB claim (DE 12, pp. 65-68). On July 06, 2009, the plaintiff timely filed for reconsideration (DE 12, p. 71). On August 21, 2009, the Commissioner again denied the claims (DE 12, pp. 74-76). On September 03, 2009, the plaintiff timely requested a hearing before an Administrative Law Judge (ALJ) (DE 12, pp. 78-79). On November 23, 2010, the plaintiff appeared before the ALJ, David Ettinger (DE 12, pp. 38-62).

---

1 Page numbers referring to the record herein reflect the Bates Stamp.

Also appearing were Rebecca Williams, the vocational expert (VE), and Grayson Cannon, the plaintiff's representative, (DE 12, p. 38). On December 09, 2010, the ALJ decided that the plaintiff was not disabled under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 416(i) and 423(d) (DE 12, pp. 19-32). On December 17, 2010, the plaintiff timely requested that an Appeals Council (AC) review the decision (DE 12, p. 15). On April 10, 2012, an AC denied the request (DE 12, pp. 1-6 ). On May 03, 2012, the plaintiff timely brought the instant action (DE 1). On July 16, 2012, the defendant filed his answer and the record (DE 11-12). On August 15, 2012, the plaintiff filed the motion for judgment on the record (DE 14) and memorandum in support of the motion (DE 15) pursuant to 42 U.S.C. §§ 405(g) and 1383(c), seeking judicial review of the final decision of the Social Security Administration (the SSA), through its Commissioner, as set out by the ALJ. On September 14, 2012, the defendant filed a response in opposition (DE 16). The matter is now properly before the Court.

## II.        Review of the Record

### A.        Relevant Medical Evidence

In 2002 and 2003, the plaintiff presented to Dr. Paul Parsons with pain and numbness in his left leg (DE 12, pp. 235-39). The plaintiff had been under the care of Dr. William Halford (DE 12, p. 235). On June 23, 2003, Dr. Parsons performed a laminectomy[2] and fusion surgery at lumbar levels L5-S1 to treat slippage of the vertebra (DE 15, p. 239). In October 2003, the plaintiff returned to full work and was "having no complaints of pain…." (DE 12, pp. 240-41).

Dr. Halford saw the plaintiff on May 12 and 23, 2006; July 27 and 28, 2006; January 23, March 30, August 10, and October 26, 2007 for primary care issues (DE 12, pp. 201-13).

---

2 Dorland's Illustrated Medical Dictionary 1003 (Elsevier 2012) (1900) (Laminectomy:  "Excision of the posterior arch of a vertebra.").

On February 07, 2008, the plaintiff presented to Dr. Halford, who noted obesity, high cholesterol, allergies, and chronic back pain (DE 12, p. 199). On February 07, 2008, the plaintiff also presented to Dr. Parsons with numbness and tingling in his left leg (DE 12, p. 243). Dr. Parsons treated the plaintiff with medication (DE 12, p. 243). On February 14, 2008, the plaintiff presented to Dr. Klekamp, a physician in Dr. Parsons' medical group, with worsened left leg pain and numbness that had had become severe over the prior two weeks (DE 12, p. 244). Dr. Klekamp noted mild degeneration at the vertebral level above the level of the previous surgery and offered to "take [the plaintiff] off work," but the plaintiff declined (DE 12, p. 244). On February 19, 2008, the plaintiff presented to Dr. Klekamp with worsening back pain and with buttock pain (DE 12, p. 245). Dr. Klekamp refilled pain medication for the plaintiff and offered the plaintiff a steroid injection, which the plaintiff declined (DE 12, p. 245).

On April 03, 2008, the plaintiff presented to Dr. Parsons, who indicated that the plaintiff "may return to work on May 03, 2008...." (DE 12, pp. 297-98). On April 14, 2008, the plaintiff presented to Dr. Parsons for a steroid injection to treat back and leg pain (DE 12, p. 232). On April 30, 2008, Dr. Parsons indicated that the plaintiff should be excused from work "as needed." (DE 12, pp. 284-86).

On May 09, 2008, Dr. Parsons performed laminectomies at L4-L5 and foraminotomies[3] at L5 to treat spinal canal narrowing at those levels (DE 15, p. 282). On May 28, 2008, the plaintiff presented to Dr. Parsons with "minor symptoms of nerve problems in the legs." (DE 12, p. 256). On June 26, 2008, the plaintiff presented to Dr. Parsons with no nerve symptoms and occasional back pain (DE 12, p. 256). Dr. Parsons noted that he would be in favor of the plaintiff

---

3 *Id.* at 731 (Foraminotomy: "The operation of removing the roof of intervertebral foramina, done for the relief of nerve root compression.").

getting a driving job, but that he did "not want [the plaintiff] doing anything that requires bending, lifting, stooping or carrying with his back." (DE 12, p. 256).

On August 07, 2008, the plaintiff reported to Dr. Parsons that he "helped a buddy in a body shop recently and got away with it." (DE 12, p. 257). Dr. Parsons provided the plaintiff with a note indicating that the plaintiff could operate commercial vehicles (DE 12, p. 256). On September 16, 2009, Dr. Parsons completed a form to indicate that the plaintiff was able to work as of August 07, 2008 and could "return to full duty with no restrictions." (DE 12, p. 252).

On February 09, 2009, an indiscernible provider in Dr. Parsons' group wrote that the plaintiff should be "off work for ten days." (DE 12, p. 250). On March 26, 2009, the plaintiff presented to Dr. Paul Buechel at the request of Dr. Parsons for muscle and nerve testing (DE 12, pp. 301-06). The plaintiff presented with "numbness, weakness, and pain" in his left leg, back, and hip, numbness in his arms, weakness in his left foot and lower leg, some numbness in the right leg and foot, alteration in his gait, and pain in his right leg (DE 12, p. 301). The plaintiff reported that the pain occurred on a daily basis (DE 12, p. 301). Dr. Buechel reported that, based on the test results, the plaintiff's arm numbness had an unknown cause and that the plaintiff may be a candidate for pain management (DE 12, p. 304).

On September 03, 2009, the plaintiff presented to Dr. Parsons with a chief complaint of numbness in his left leg and foot, but without pain (DE 12, p. 337). Dr. Parsons indicated that he did not think there would be a solution to the plaintiff's problem but did "encourage him to at least get a consultation from a pain management group." (DE 12, p. 337). On September 09, 2009, the plaintiff presented to Dr. Son Le (DE 12, pp. 323-25). Dr. Le ordered physical therapy, further testing, and a narcotic pain management regimen (DE 12, pp. 324-25). From September 16 to November 20, 2009, the plaintiff completed weekly physical therapy (DE 12, pp. 361-71).

On October 06, 2009, the plaintiff presented to Dr. Le with leg pain down to his foot and Dr. Le prescribed an increase in the plaintiff's neuropathic pain medication (DE 12, p. 356). On October 27, 2009, Dr. Le completed a study in which he found normal results for both legs except for "maybe a trace of…chronic left L5-S1 [nerve root damage]." (DE 12, p. 351).

On November 06, 2009, Dr. Halford completed a medical source statement in which he noted that the plaintiff could, without stooping, frequently carry up to ten, occasionally carry eleven to twenty, but never carry more than twenty pounds (DE 12, p. 340). Dr. Halford noted that the plaintiff could sit, stand, or walk for five to ten minutes at a time without interruption, could sit for two hours out of an eight hour day, could stand or walk for one hour out of an eight hour day, could not be at work for eight hours, could use his hands, could operate foot controls occasionally because of numbness in his feet, could rarely climb stairs or ramps, could never climb ladders or scaffolds, could not balance, stoop, kneel, crouch, or crawl, had varying environment limitations, and could not walk on uneven surfaces (DE 12, pp. 340-45).

On November 17, 2009, the plaintiff presented to Dr. Le with pain in his left leg and neck, and Dr. Le prescribed pain medication (DE 12, p. 349-50). From March 25 to July 25, 2010, the plaintiff presented to Dr. John Faccia for pain management (DE 12, pp. 45, 374-432). The plaintiff switched providers due to insurance loss (DE 12, p. 45). On May 6 and June 30, 2010, the plaintiff received nerve blocks to treat neuropathy and leg pain (DE 12, pp. 390, 405).

On January 24, 2011, Dr. Parsons wrote a letter to the plaintiff's attorney and indicated that "[h]aving already had two back operations and one unsuccessful return to work, I do not believe at this time that [the plaintiff] is going to be able to hold down any type of employment that requires any physical effort at all." (DE 12, p. 433).

## B. State Agency Medical Consultant Assessments

On June 16, 2009, Dr. George Cross III completed a Physical Residual Functional Capacity (RFC) Assessment (DE 12, p. 317). He found that the plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand and/or walk, or sit for six hours of an eight hour day, had no limitation on pushing or pulling, could occasionally climb a ramp or stairs, could never climb a ladder, rope, or scaffolds, could balance and stoop frequently, could kneel and crawl occasionally, had no communicative, visual, manipulative, or environmental limitations (DE 12, pp. 311-14). Dr. Cross found that:

> The alleged low back pain radiating down the left leg to the foot worsened by sitting, standing, bending, and lying down is partially credible. The claimant had an LS-Sl fusion in 2003 with good results. He developed recurrent symptoms for which he underwent an L4-S decompressive procedure…The most current neurologic examination…is normal. The alleged exertional and postural limitations and pain are therefore partially credible.

(DE 12, p. 314). Dr. Moore reviewed and affirmed this RFC determination (DE 12, p. 318).[4]

## C. Testimonial Evidence

### 1. Plaintiff and Witness Testimony

On November 23, 2010, the ALJ testified on direct examination by his representative, Cannon (DE 12, p. 42). Cannon first gave an opening statement in which he indicated that the plaintiff's treating physician, Dr. Halford, had completed a medical source statement and the evidence therein would prohibit the plaintiff from working full-time (DE 12, p. 42). The plaintiff then testified that he was forty-seven years old (DE 12, p. 42). The plaintiff testified that he first had back surgery in 2005[5] and returned to work afterwards, but that he needed a second surgery in 2008 (DE 12, pp. 43-44). The plaintiff testified that he takes medication daily (DE 12, p. 43)

---

4 (DE 12, pp. 317-18) The record shows that Dr. Moore refers to the RFC determination from 06/06/09, which seems to be an error since the RFC determination referred to therein was completed on 06/16/09.
5 (DE 12, p. 239) Plaintiff had back surgery first on June 23, 2003.

and he went to pain management after his second surgery, where he received "Cymbalta and stuff like it." (DE 12, p. 44). The plaintiff testified that he took "Lortab and pain medications like that." (DE 12, p. 44). Cannon asked whether the plaintiff had side effects from his medication and the plaintiff testified that he had loss of memory and instability when walking (DE 12, pp. 44-45). The plaintiff testified that Dr. Faccia[6] was currently treating him for pain management, that Dr. Halford had been his primary doctor for ten or fifteen years, and that he was still under the care of Dr. Halford in addition to Dr. Faccia (DE 12, pp. 45-46).

The plaintiff testified that he could sit for a few minutes at a time, that the pain in his left leg and back was constantly present, and that his leg was "always numb." (DE 12, pp. 46-47). The plaintiff testified that he stopped taking Cymalta because of undesirable side effects and that he did not believe the Cymbalta was helpful (DE 12, pp. 46-47). The plaintiff testified that he was unable to lift heavy items, that his wife performed the household chores, and that he normally took a daily nap (DE 12, pp. 47-48). The plaintiff testified about his daily activities, stating, "I just hang out. I have a couple of friends and I usually sit around the house and watch T.V. I will go eat lun[ch] with my friend occasionally in Fairview, which is just down the road [ten miles] from my house." (DE 12, pp. 47-48). The plaintiff testified that he was able to mow his yard on a riding lawnmower, while medicated, for about thirty minutes (DE 12, p. 49).

The plaintiff testified that he had his General Education Degree (GED) (DE 12, p. 49). The plaintiff testified that prior to his second surgery in 2008, he was working at Franklin Webb Printing where he drove a truck, lifted up to seventy pounds, and pushed a cart with up to fifteen hundred pounds of contents (DE 12, p. 50). The plaintiff testified that after the surgery in 2008, he went through rehabilitative treatment and returned to work before being released (DE 12, p.

---

6 (DE 12, p. 45) Dr. Faccia is incorrectly spelled "Dr. Fasha" in the transcript from the hearing.

44). However, the plaintiff testified that Franklin Webb Printing did not have any "easy work" that he could perform and that he was terminated (DE 12, p. 44). The plaintiff testified that he then briefly worked as a floor sweeper and as a truck driver until his "back went out again" and his doctor indicated that he could no longer work as a truck driver (DE 12, p. 51).

After Cannon's questioning, the ALJ questioned the plaintiff. He asked the plaintiff why he had been unable to return to his job at Franklin Webb Printing after the surgery in 2008 and why he was ultimately terminated (DE 12, p. 51). The plaintiff testified that despite being "100 percent released" by his physician to perform his previous work, and despite not being restricted to light work, the owner of the printing company indicated that there was no light work available and that the plaintiff was therefore terminated (DE 12, pp. 51-52). The plaintiff testified that he had never been to the Division of Vocational Rehabilitation (DE 12, p. 53). The ALJ asked the plaintiff whether he had considered jobs with "very few physical demands." (DE 12, p. 54). The plaintiff testified that he had not (DE 12, p. 54).

Cannon resumed questioning the plaintiff and asked whether the plaintiff would have difficulty performing a "simple little job that didn't involve a lot of lifting where [he] could sit." (DE 12, p. 54). The plaintiff testified that he would have to be off of his medication in order to drive to any job and that he did not believe he could work for four days doing anything because he "[could not] make it a full day at home." (DE 12, p. 54).

## 2. Vocational Expert Testimony

The VE testified that the plaintiff's past work as an inserting machine operator is classified as light,[7] unskilled work[8] (DE 12, p. 56). The VE testified that the plaintiff's past work

---

7 20 C.F.R. § 416.967 ("To determine the physical exertion requirements of work in the national economy, [jobs are classified] as *sedentary, light, medium, heavy, and very heavy*.") (emphasis added).

as a mailing machine operator is classified as medium, skilled work with an SVP of 5[9] (DE 12, p. 56). The VE testified that the plaintiff's past work as a "light, truck driver" is classified as medium, semiskilled work with an SVP of 3 (DE 12, p. 56).[10] The VE testified that the plaintiff's past work as a warehouse worker/local delivery is usually classified as medium, unskilled work (DE 12, p. 56). However, since the plaintiff worked with things in excess of one hundred pounds and since he had to load and unload the truck by hand, the past work would actually be classified as a truck driver helper, which is heavy, unskilled work (DE 12, p. 57).

The ALJ then presented the VE with hypothetical scenarios, considering a hypothetical person of the same age and education as the plaintiff, but with varying RFC:

> The first hypothetical would limit the person to light work with no climbing of ladders, no more than occasional climbing of stairs, kneeling, and crawling and no more than frequent balancing, stooping, or crouching.

(DE 12, p. 57). Pertaining to this hypothetical, the VE testified that the plaintiff could perform only his past work as an inserting machine operator (DE 12, p. 57). Besides his past work, the plaintiff could work as (a) a stock marker, with 4,000 employed in Tennessee and 168,000 employed nationally in this job; (b) a cleaner, with 5,000 employed in Tennessee and 260,000 employed nationally in this job; and (c) a bottling line attendant, with 2,000 employed in Tennessee and 100,000 employed nationally in this job (DE 12, P. 58)

---

8 20 C.F.R. § 416.968 ("In order to evaluate [the plaintiff's] skills…occupations are classified as ***unskilled, semi-skilled, and skilled***.") (emphasis added).
9 SSR 00-4P, 2000 WL 1898704 ("The Dictionary of Occupational Titles (DOT) lists a **specific vocational preparation (SVP)** time for each described occupation. Using the skill level definitions in 20 C.F.R. §§ 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT.") (emphasis added).
10 There is some ambiguity related to the plaintiff's past work as a truck driver and whether it would be ***light*** or ***medium***. The physical exertion requirements indicated in the Dictionary of Occupational Titles (DOT) 906.683-022, which describes work as "a truck driver, light," are "***medium…in excess of those for [l]ight [w]ork***." DICOT 906.683-022 (G.P.O.), 1991 WL 687717 (emphasis added). The VE testified that the physical exertion requirement of the plaintiff's past work as a "light, truck driver" would be medium (DE 12, p. 56). The DOT description of the work as a "truck driver, light" and the VE testimony referring to a "light, truck driver" appear contradictory to the physical exertion requirement of medium. However, the occupation title and the physical exertion requirement are wholly separate considerations.

The second hypothetical would limit the person to sedentary work.

(DE 12, p. 58). Pertaining to this hypothetical, the VE testified that the plaintiff could not perform any of his past work, or any of the aforementioned jobs, but that he could work as (a) a cuff folder, with 700 employed in Tennessee and 68,000 nationally in this job; (b) a film touch up inspector, with 700 employed in Tennessee and 40,000 nationally in this job; (c) a wire inserter, with 2,500 employed in Tennessee and 80,000 nationally in this job (DE 12, pp. 58-59).

The ALJ asked the VE whether there would be an impact on any of the jobs identified if a hypothetical person had to alternate sitting and standing every two hours for at least five minutes (DE 12, p. 59). The VE testified that there would be no impact on the sedentary jobs identified (DE 12, p. 59). The VE testified that for the light jobs identified, there would be no impact on the stock marker job, the cleaner job would be eliminated, and there would fewer bottling line attendant jobs (DE 12, p. 59).

The ALJ asked the VE whether there would be an impact on the jobs identified if a hypothetical person had to alternate sitting and standing every hour for at least five minutes, instead of every two hours (DE 12, p. 60). The VE testified that this would not make any difference (DE 12, p. 60). The ALJ asked the VE whether there would be an impact on the jobs identified if a hypothetical person had to lie down for four hours of an eight hour day (DE 12, p. 60). The VE testified that there would be no jobs available for such a hypothetical person.

Cannon asked the VE whether the medical source statement that Dr. Halford had completed would permit the plaintiff to perform any of his past relevant work (DE 12, p. 60). The VE testified that it would not (DE 12, p. 60). Cannon asked the VE whether the medical source statement would allow for any other work (DE 12, p. 60). The VE testified that it would not because the statement would allow for only "less than full-time work." (DE 12, p. 60).

# III.      Analysis

## A.      Standard of Review

The issue before the Court, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), is limited to whether there is substantial evidence in the record to support the Commissioner's findings of fact. "Substantial evidence" is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Carrelli v. Comm'r of Soc. Sec.*, 390 F. App'x 429, 434 (6th Cir. 2010) (quoting *Cutlip v. Sec'y of Health & Human Servs.,* 25 F.3d 284, 286 (6th Cir.1994)). The Court "may not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Carrelli*, 390 F. App'x at 434.   If there is "substantial evidence" in the record that supports the Commissioner's decision and the Commissioner applied the correct legal standard, then the Court must affirm the Commissioner's final decision, "even if the Court would decide the matter differently, and even if substantial evidence also supports the [plaintiff's] position." *Id.* (citing *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir.1986) (en banc)).

## B.      Administrative Proceedings

Disability is defined for Title II DIB claims as an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months…." 42 U.S.C. §§ 423(d)(1)(A) and 1382(c)(a)(3)(A); 20 C.F.R. § 404.1505. The ALJ uses a five-step sequential evaluation for DIB claims to determine whether the plaintiff meets this definition of "disabled." 20 C.F.R. § 404.1520(a)(4)(i)-(v).

   i.    If the plaintiff is engaged in substantial gainful activity, the Court will find that the plaintiff is not disabled.

ii. If the plaintiff *does not* have a severe medically determinable physical or mental impairment meeting the duration requirement or a combination of such impairments, the Court will find that the plaintiff is not disabled.

iii. If the plaintiff *does* have an impairment(s) that meets or equals one of the listings of impairments in 20 C.F.R. pt. 404, Subpt. P, App. 1 (Appendix 1) and meets the duration requirement, the Court will find that the plaintiff is disabled.

iv. The court considers the plaintiff's Residual Functional Capacity (RFC) and past relevant work. If the plaintiff can still perform their past relevant work, the Court will find that they are not disabled.

v. The Court considers the plaintiff's RFC, age, education, and experience to determine if the plaintiff can perform work *other than* past relevant work. If the plaintiff can make an adjustment, the Court will find that they are not disabled.

The plaintiff has the burden of proof for steps one to four. *Carrelli*, 390 F. App'x at 435. The burden shifts to the Commissioner at step five, where the Commissioner must "identify a significant number of jobs in the economy that accommodate the [plaintiff's] RFC and vocational profile." *Id.* To meet the burden, the ALJ may use the medical-vocational guidelines in 20 C.F.R. pt. 404, Subpt. P, App. 2 (Appendix 2). 20 C.F.R. § 404.1569.

Appendix 2 is referred to as "the grid," and provides guidance to the ALJ in determining whether the plaintiff is disabled or whether significant numbers of *other* jobs exist for the plaintiff. *Wright v. Massanari*, 321 F.3d 611, 615 (6th Cir. 2003). "Where the findings of fact made with respect to a particular individual's vocational factors and RFC coincide with all of the criteria of a particular rule [in the grid], the rule directs a conclusion as to whether the individual is or is not disabled." *Anderson v. Comm'r of Soc. Sec.*, 406 F. App'x 32, 35 (6th Cir. 2010) (quoting Appendix 2 at § 200.00(a)). Otherwise, instead of using the grid alone, the ALJ must consider all relevant facts. 20 C.F.R. § 404.1569.

### C.  Administrative Reliance on Vocational Expert Testimony

If a plaintiff's limitations "do not satisfy the exact requirements of the medical-vocational guidelines, the ALJ [is] entitled to rely on the testimony of a VE in reaching his decision" as to whether the plaintiff is disabled or whether the plaintiff is not disabled and a significant number of jobs exist that the plaintiff can perform. *Range v. Soc. Sec. Admin.*, 95 F. App'x 755, 757 (6th Cir. 2004).  If an "issue in determining whether [a plaintiff] is disabled is whether [their] work skills can be used in other work and the specific occupations in which they can be used…, [the ALJ] may use the services of a VE…." 20 C.F.R. § 404.1566(e).

What number of jobs in the national economy constitutes a "significant number" of jobs is a determination that must be made on a case-by-case basis. *Born v. Sec'y of Health & Human Servs.*, 923 F.2d 1168, 1174 (6th Cir. 1990) (citing *Hall v. Bowen,* 837 F.2d 272, 275 (6th Cir. 1988)). The ALJ may consider "the level of claimant's disability; the reliability of the vocational expert's testimony; the reliability of the claimant's testimony; the distance claimant is capable of travelling to engage in the assigned work; the isolated nature of the jobs; the types and availability of such work, and so on." *Id.*

### D.  Notice of Decision

On December 09, 2010, the ALJ denied the plaintiff's claims and made the findings of fact and conclusions of law enumerated below.

1. Claimant meets the insured status requirements of the Act through December 13, 2012.

2. Claimant has not engaged in substantial gainful activity since March 17, 2008, the alleged onset date.

3. Claimant has the following severe impairments:  degenerative disc disease and obesity.

4. Claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in Appendix 1.

5. Claimant has the RFC to perform sedentary work except he must be allowed to alternate sitting and standing every hour; cannot climb ladders; cannot more than occasionally climb stairs, kneel, or crawl; and cannot more than frequently balance, stoop, or crawl.

6. Claimant is unable to perform any past relevant work.

7. Claimant was 44 years old on the alleged disability onset date. The claimant subsequently changed age category to a younger individual age 45-49.

8. Claimant has at least a high school equivalent education and is able to communicate in English.

9. Transferability of job skills is not material to the determination of disability.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

(DE 12, pp. 24-27). On December 09, 2010, the ALJ made the specific decision below.

1. Based on the application for DIB filed on April 07, 2009, the claimant is not disabled under sections 216(i) and 223(d) of the Act [42 U.S.C. §§ 416(i) and 423(d)].

(DE 12, p. 28).

## IV.     Claims of Error

### A.     Weight Given to the Treating Physician's Opinion

The plaintiff argues that the ALJ failed to give adequate weight to the opinions and medical source statement of the plaintiff's treating physician, Dr. Halford (DE 15, p. 10). The plaintiff argues that the ALJ decided that Dr. Halford's opinion was not fully credible "solely because [the plaintiff] was released to return to work [by Dr. Parsons] and 'there [was] no evidence he sought further orthopedic treatment.'" (DE 15, p. 10, quoting the record). The plaintiff argues that this rationale is an inaccurate recitation of Dr. Parson's orthopedic records,

which, according to the plaintiff, indicate that the plaintiff did return to Dr. Parsons after Dr. Parsons released him for work, and did so complaining of the same symptoms that he had prior to surgery (DE 15, pp. 10-11). The plaintiff also argues that the ALJ's rationale "completely ignores the report of Dr. Buechel…, who also noted '[the plaintiff] may well be a candidate for pain management.'" (DE 15, pp. 11, quoting the record).

A "treating source" is a plaintiff's "physician, psychologist, or other acceptable medical source who provides…or has provided…medical treatment or evaluation and who has, or has had, an ongoing treatment relationship[11] with [the plaintiff]." 20 C.F.R. § 404.1502. When an ALJ reviews "medical evidence supplied in support of a claim, there are certain governing standards to which an ALJ must adhere. Key among these is that greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians, commonly known as the ***treating physician rule***." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (emphasis added) (citing SSR 96–2P, 1996 WL 374188; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir.2004)).

The record shows that the ALJ did not fail to give adequate weight to Dr. Halford's opinion, did not use inaccurate information, and did not ignore a report by Dr. Buechel. As a threshold matter, the plaintiff's argument that the ALJ failed to give *adequate weight* to Dr. Halford's opinion is more properly considered with the argument about whether the ALJ failed to give good reasons for *discounting* the opinion, addressed below,[12] than with the argument herein about whether the ALJ inaccurately read or wholly ignored the medical records. Whether

---

11 20 C.F.R. §§ 404.1502 and 416.902 (An "ongoing treatment relationship" is a relationship for which "the medical evidence establishes that [the plaintiff] see[s], or ha[s] seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition(s). [An ALJ] may consider an acceptable medical source who has treated or evaluated [a plaintiff] only a few times or only after long intervals…to be [the] treating source if the nature and frequency of the treatment or evaluation is typical for [the] condition(s).").

12 *See infra* Part IV.B.

the weight that the ALJ gave to Dr. Halford's opinion was *adequate* turns on whether good reasons were proffered by the ALJ in his weight determination.

The record shows that the ALJ did not rely on an inaccurate recitation of Dr. Parson's records when deciding what weight to give to Dr. Halford's opinion. Instead, the ALJ considered the fact that Dr. Parsons released the plaintiff to work postoperatively in August 2008, but that the plaintiff subsequently saw Dr. Buechel and Dr. Parsons with problems (DE 12, pp. 25-26). The plaintiff saw Dr. Buechel in March 2009, at the request of Dr. Parsons, for "numbness, weakness, and pain." (DE 12, p. 26; citing exhibit 4F). In September 2009, Dr. Parsons informed the plaintiff that he did not think there was going to be a solution to his problem but scheduled a pain management consultation (DE 12, p. 26; citing exhibit 8F). The record shows that the ALJ relied on Dr. Parsons' release of the plaintiff to work and the plaintiff's failure to seek further treatment when deciding the credibility of the plaintiff, not when deciding what weight to give to Dr. Halford's opinion: "I give significant weight to [the plaintiff's] testimony….he was released to work as a truck driver. There is no evidence of any subsequent injury and [the plaintiff] never sought further orthopedic treatment." (DE 12, p. 26). Therefore, the record provides substantial evidence that the ALJ did not rely on an inaccurate recitation of Dr. Parsons' records.

In addition to the record showing that the ALJ did not rely on an inaccurate recitation of Dr. Parson's orthopedic records, the record also shows that the ALJ did not "solely" rely on Dr. Parsons' release of the plaintiff back to work when deciding what weight to give to Dr. Halford's opinion. Instead, the record provides substantial evidence that the ALJ gave other reasons for discounting the opinion of Dr. Halford, as addressed below.[13]

---

13 *Id.*

The record provides substantial evidence that the ALJ did not ignore the report of Dr. Buechel. Instead, as mentioned, the ALJ considered the fact that the plaintiff saw Dr. Buechel in March 2009 (DE 12, p. 26, citing exhibit 4F page 301). The record shows that the ALJ also considered the fact that the plaintiff ultimately "asked for a referral to a pain clinic" (DE 12, p. 26), as Dr. Buechel indicated the plaintiff might want to consider (DE 10, p. 304).

The record provides substantial evidence that the ALJ did not discount Dr. Halford's opinion based on an inaccurate recitation of Dr. Parson's postoperative medical reports, on an exclusive reliance on Dr. Parson's records, or on ignorance of Dr. Buechel's treatment record.

### B.    Good Reasons for Discounting the Opinion of a Treating Physician

The plaintiff argues that the ALJ failed to give good reasons for discounting the opinion of Dr. Halford because the ALJ's conclusion, that "'Dr. Halford fail[ed] to reference any abnormal medical findings that support his opinion,'" was inaccurate (DE 15, p. 11, quoting the record). The plaintiff also argues that the ALJ failed to consider the factors that an ALJ must consider when they do not give controlling weight to opinion of a treating physician (DE 15, p. 12). The plaintiff finally argues that the alleged failure by the ALJ to provide good reasons for discounting the opinion of Dr. Halford was not harmless error (DE 15, pp. 13-14).

According to the treating physician rule, and pursuant to 20 C.F.R. § 404.1527(c)(2), "[i]f [an ALJ] find[s] that a treating source's opinion on the issue(s) of the nature and severity of [the plaintiff's] impairment(s) is well-supported…and is not inconsistent with the other substantial evidence…, [the ALJ] will give it controlling weight."  20 C.F.R. § 404.1527(c)(2); *Wilson*, 378 F.3d at 544.

"There is an additional procedural requirement associated with the treating physician rule [whereby]…the ALJ must provide '***good reasons***' for discounting treating physicians'

opinions…." *Rogers*, 486 F.3d at 242 (emphasis added). In other words, if an ALJ ***does not*** give a treating source's opinion controlling weight, then the ALJ must provide good reasons for the weight they do give to the treating source's opinion. 20 C.F.R. § 404.1527(c)(2). "This ***procedural 'good reasons' rule*** serves both to ensure adequacy of review and to give the claimant a better understanding of the disposition of his case." *Dunlap v. Comm'r of Soc. Sec.*, 509 F. App'x 472, 474 (6th Cir. 2012) (emphasis added) (citing *Rogers*, 486 F.3d at 242). The procedural good reasons rule is important "particularly in situations where a [plaintiff] knows that [their] physician has deemed [them] disabled and therefore 'might be especially bewildered when told by an administrative bureaucracy that [they are] not, unless some reason for the agency's decision is supplied.'" Wilson, 378 F.3d at 544-45 (quoting *Snell v. Apfel,* 177 F.3d 128, 134 (2d Cir.1999)).

If an ALJ ***does not*** give a treating source's opinion controlling weight, then the ALJ must consider all of the following factors in deciding what discounted weight to give to the treating sources's opinion:  (c)(1) examining relationship; (c)(2)(i) length of the treatment relationship and frequency of examination; (c)(2)(ii) nature and extent of the relationship; (c)(3) supportable medical evidence; (c)(4) evidence that is consistent with the record; (c)(5) specialization; and (c)(6) other factors. 20 C.F.R. § 404.1527(c).

The Sixth Circuit has ruled that the treating physician rule is a mandatory procedural requirement. *Wilson*, 378 F.3d at 546. "A court cannot excuse the denial of a mandatory procedural protection simply because…there is ***sufficient evidence*** in the record for the ALJ to discount the treating source's opinion and, thus, a different outcome on remand is unlikely." *Id.* (emphasis added). Therefore, despite the standard of review whereby the reviewing Court is limited to determining whether there is ***substantial evidence*** in the record to support the

Commissioner's findings of fact, no amount of substantial evidence in the record can excuse an ALJ's failure to follow the treating physician rule. "To hold otherwise, and to recognize ***substantial evidence*** as a defense to non-compliance with § 1527([c])(2),[14] would afford the [ALJ] the ability the violate the regulation with impunity and render the protections promised therein illusory." *Id.* (emphasis added). However, the Sixth Circuit has also ruled that there are potential scenarios in which an ALJ's failure to follow the treating physician rule could constitute a "de minimis violation," and therefore "harmless error." *Wilson*, 378 F.3d at 547.[15]

The record shows that the ALJ discounted the weight he gave to Dr. Halford's opinion from "controlling weight" to "some weight," in compliance with the treating physician rule because the ALJ found a lack of support for the opinion of Dr. Halford and a lack of consistency between the record and the opinion of Dr. Halford (DE 12, p. 25). The ALJ noted that Dr. Halford's medical source statement failed to include "any abnormal medical findings [to] support his opinion," and noted that "Dr. Halford's opinion [was] contrary to the evidence that [Dr. Parsons] released [the plaintiff] to work as a truck driver…" (DE 10, p. 27), rendering the opinion not "well-supported…" and also "inconsistent with the other substantial evidence…" and precluding conferment of controlling weight under 20 CFR § 404.1527(c)(2). The record shows that within Dr. Halford's medical source statement, there were nine places in which the provider was instructed to identify the medical or clinical findings that "support [the] assessment" (DE 10, pp. 340-45). Of these places, the record shows that Dr. Halford left six

14 20 C.F.R. § 404.1527(d)(2) (current version at 20 C.F.R. § 404.1527(c)(2) (2012)).
15 *Wilson*, 378 F.3d at 547 (These potential scenarios include when: (1) "a treating source's opinion is so patently deficient that the [ALJ] could not possibly credit it;" (2) "the [ALJ] adopts the opinion of the treating source or makes findings consistent with the opinion, [in which case] it may be irrelevant that the ALJ did not give weight to the treating physician's opinion, and the failure to give reasons for not giving such weight is correspondingly irrelevant;" or (3) "the [ALJ] has met the goal of § 1527([c])(2) …even though [they have] not complied with the terms of the regulation."). *Id.*

places blank (DE 10, pp. 342-45), wrote "reaching and holding objects away from the body greatly aggravates back pain" in one place (DE 10, p. 342), and wrote or referred to "advanced lumbar degenerative disc disease, spinal canal narrowing, despite two operations" in two places (DE 10, pp. 340-41). Therefore, the record provides substantial evidence that the ALJ discounted the weight he gave to the opinion of Dr. Halford in compliance with the treating physician rule.

The record shows that Dr. Halford's opinion did not meet the requirements for controlling weight, and that the ALJ therefore proceeded to give good reasons for giving "some weight" to Dr. Halford's opinion. The record shows that these reasons reflect the factors which the ALJ must consider when not giving controlling weight to the opinion of a treating source under 20 C.F.R. § 404.1527(c). The ALJ considered the (c)(1) examining relationship, when acknowledging that Dr. Halford was the plaintiff's "primary care physician." (DE 10, p. 25). The ALJ considered the (c)(2)(i) length of the treatment relationship and frequency of examination as well as the (c)(2)(ii) nature and extent of the relationship, when noting that Dr. Halford saw the plaintiff in May 2008 and documented that the plaintiff had "obesity with a sedentary lifestyle, along with degenerative disc disease." (DE 10, p. 25). The ALJ considered the lack of (c)(3) supportable medical evidence and (c)(4) evidence that is consistent with the record, as described in the preceding paragraph. The ALJ considered the (c)(5) specialization of the plaintiff's treating orthopedic doctors and acknowledged that Dr. Halford was a primary care physician, not a specialist (DE 10, p. 25). While the ALJ could have been more explicit in delineating these factors, the record provides substantial evidence that the ALJ did consider these factors and did state the reasoning behind his decision to discount the weight given to Dr. Halford's opinion.

The record shows that the ALJ complied with the treating physician rule when assessing the opinion of Dr. Halford and providing good reasons for discounting the opinion. Therefore,

the Court does not need to address whether a failure to comply with the treating physician rule constituted a de minimis violation of the regulation or harmless error on the part of the ALJ.

The record provides substantial evidence that the ALJ did not err in finding a lack of support or consistency between the record and the opinion of Dr. Halford, did not fail to give good reasons for discounting the opinion of Dr. Halford from "controlling weight" to "some weight," did not overlook the testimony of the plaintiff, and did not make his decision in such a way so as to thwart even the harmless error exception.

## C.    New and Material Evidence

The plaintiff argues that additional post hearing evidence dated January 24, 2011 should be considered new and material evidence that "relates to the treatment of the [plaintiff] prior to the hearing and explains what was apparently a misapprehension of the evidence by the ALJ." (DE 15, p. 14). The January 24, 2011 evidence consists of a letter from Dr. Parsons, in response to an inquiry from the plaintiff's representative (DE 12, p. 433). Dr. Parsons wrote that "[h]aving already had two back operations and one unsuccessful return to work, I do not believe at this time that [the plaintiff] is going to be able to hold down any type of employment that requires any physical effort at all." (DE 12, p. 433).

"A district court's authority to remand a case…is found in 42 U.S.C. § 405(g).…" *Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 482-83 (6th Cir. 2006). "Sentence four" and "sentence six" of this statute both authorize remands. *Hollon ex rel. Hollon*, 447 F.3d at 483. Sentence four provides that "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Therefore, "a district court may order a 'sentence four' remand…, if it

determines that a rehearing before the Commissioner is warranted…." *Hollon ex rel. Hollon*, 447

F.3d at 483. Sentence six provides:

> The court may, on motion of the Commissioner of Social Security made for good cause shown before the Commissioner files the Commissioner's answer, remand the case to the Commissioner of Social Security for further action by the Commissioner of Social Security, ***and it may at any time order additional evidence to be taken before the Commissioner of Social Security***, but only upon a showing that there is ***new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding***; and the Commissioner of Social Security shall, after the case is remanded, and after hearing such additional evidence if so ordered, modify or affirm the Commissioner's findings of fact or the Commissioner's decision, or both, and shall file with the court any such additional and modified findings of fact and decision, and, in any case in which the Commissioner has not made a decision fully favorable to the individual, a transcript of the additional record and testimony upon which the Commissioner's action in modifying or affirming was based.

42 U.S.C. § 405(g) (emphasis added). Before the district court may order a remand under

"sentence six," the party seeking a remand must meet their burden of showing "(i) that the

evidence at issue is both 'new' and 'material,' and (ii) that there is 'good cause for the failure to

incorporate such evidence into the record in a prior proceeding.'" 42 U.S.C. § 405(g); *Hollon ex*

*rel. Hollon*, 447 F.3d at 483.

Evidence is "new" "if it was not in existence or available to the claimant at the time of

the administrative proceeding." *Hollon ex rel. Hollon*, 447 F.3d at 484 (quoting *Foster v. Halter*,

279 F.3d 348, 357 (6th Cir.2001) (internal quotation marks and citation omitted)). Evidence is

"material if "'there is a reasonable probability that the [Commissioner] would have reached a

different disposition of the disability claim if presented with the new evidence.'" *Id.* A plaintiff

can show "good cause for the failure to incorporate such evidence "by demonstrating a

reasonable justification for the failure to acquire and present the evidence for inclusion in the

hearing before the ALJ." *Id.*

The record shows that the plaintiff has not met the burden of presenting all of the prerequisites for a "sentence six" remand. The January 2011 letter is new because it was written after the December 09, 2010 hearing and was therefore not in existence at the time of the hearing (DE 12, p. 433). However, the plaintiff does not show that the letter was "material." The plaintiff does not show that the ALJ would have reached a different decision if he had the letter from Dr. Parsons. The plaintiff does not show that the ALJ had a "misapprehension of the evidence" for which the letter could now cure. Instead, the record shows that the ALJ considered the plaintiff's treatment records and the timeline of care after the plaintiff's second surgery in June 2008, as discussed above,[16] including Dr. Parsons' opinion that nothing further could be done to help the plaintiff's symptoms and Dr. Halford's opinion that the plaintiff could not work an eight hour day (DE 12, pp. 337, 341). The plaintiff does not show and the record does not suggest that Dr. Parsons' letter would have caused the ALJ to decide the RFC differently than he did with the records at the hearing. With those records, the ALJ acknowledged that the plaintiff "attempted to work as a truck driver after his back surgery," noted that the plaintiff "never thought about attempting work that [was] less physically demanding," and noted that "[the plaintiff] did not think he could perform any job on a full time basis." (DE 12, p. 26). Based on those records, the ALJ determined an RFC of sedentary work with restrictions for the plaintiff (DE 12, p. 25). The plaintiff does not show how Dr. Parsons' letter would have displaced the decision-making of the ALJ based on the records that he had at the hearing. Therefore, the record provides substantial evidence that the plaintiff has failed to show that the letter would constitute "material evidence."

Further, the plaintiff does not show that there was "good cause for the failure to incorporate" the letter in the hearing. The plaintiff does not show that the letter was unavailable

---

16 *See supra* Part IV.A.

to or unattainable by the plaintiff leading up to the hearing before the ALJ. The plaintiff has not shown any difficulty in the receipt of records from the office of Dr. Parsons or any inability to secure the letter prior to the proceeding. Instead, the plaintiff requested that an AC review the decision of the ALJ on December 17, 2010 (DE 12, p. 15) and received the letter from Dr. Parsons quickly enough to include it in that request (DE 12, p. 4). Therefore, the record provides substantial evidence that the plaintiff has failed to show "good cause" for not obtaining the letter prior to and including the letter in the hearing.

Therefore, the record provides substantial evidence that the January 24, 2011 letter does not meet the requirements of a "sentence six" remand under 42 U.S.C. § 405(g).

### C. Credibility Determination

The plaintiff argues that the ALJ did not support his determination of the plaintiff's credibility with substantial evidence (DE 15, p. 15). The plaintiff also argues that the plaintiff's testimony deserved greater deference than it received because it was consistent with uncontradicted medical evidence (DE 15, p. 15). Finally, the plaintiff argues that the ALJ "concluded that [the plaintiff's] allegations of pain and limitations were not fully credible "***solely*** because [the plaintiff] was released to return to work [by Dr. Parsons] and 'there [was] no evidence [the plaintiff] sought further orthopedic treatment'" and because the plaintiff's allegations were "'inconsistent with his limited medical treatment.'" (DE 15, p. 15, quoting the record). Regarding the latter point, the plaintiff also alleges that "to call two back surgeries with residual pain and numbness requiring ongoing pain management care with narcotics 'limited medical treatment' is beyond a loose use of the term." (DE 15, p. 16).

When the ALJ considers the plaintiff's credibility and the plaintiff's symptoms in the context of making the disability determination, they use a two-part process for symptom

evaluation. SSR 96-7P, 1996 WL 374186. First, "the [ALJ] must consider whether there is an underlying medically determinable physical or mental impairment…that could reasonably be expected to produce the individual's…symptoms." Next, "the [ALJ] must evaluate the intensity, persistence, and limiting effects of the…symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." SSR 96-7P, 1996 WL 374186. A plaintiff's symptoms will limit their ability to do basic work activities to the extent that the symptoms can reasonably be accepted as consistent with objective medical evidence. However, objective evidence alone does not always reflect the severity of symptoms. When information other than objective evidence is needed to determine the credibility of a plaintiff's statements about their symptoms, the ALJ must also consider seven specific factors. 20 C.F.R. § 404.1529(c). The factors are: (1) daily activities; (2) location, duration, frequency, and intensity; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of medication; (5) treatment; (6) measures to relieve pain or other symptoms; and (7) factors concerning functional limitations and restrictions. 20 C.F.R. § 404.1529(c).

"[Plaintiff] [c]redibility determinations with respect to subjective complaints of pain rest with the ALJ." *Torres v. Comm'r of Soc. Sec.*, 490 F. App'x 748, 755 (6th Cir. 2012) (quoting *Allen v. Comm'r of Soc. Sec.,* 561 F.3d 646, 652 (6th Cir.2009)) (internal quotation marks and alterations omitted). The ALJ's plaintiff credibility determinations "are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Torres*, 490 F. App'x at 755 (6th Cir. 2012) (quoting *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir.1997)). However, "[i]n light of…***uncontradicted*** and overwhelming medical and lay evidence" of a plaintiff's symptoms, a court may "decline to give substantial deference to [an] ALJ's ***unexplained*** credibility finding."

*King v. Heckler*, 742 F.2d 968, 975 (6th Cir. 1984) (emphasis added). In other words, when "uncontroverted medical evidence in the record is entirely *consistent* with a witness's testimony, an ALJ may not disregard that evidence…." *Anthony v. Astrue*, 266 F. App'x 451, 460 (6th Cir. 2008) (citing *Harris ex rel Harris v. Heckler,* 756 F.2d 431, 436 (6th Cir.1985)). However, when there is conflicting medical evidence, and ALJ "must necessarily make credibility determinations." *Anthony*, 266 F. App'x at 460 (citing *King,* 742 F.2d at 974). When an "ALJ [has] considered the evidence in the record and provided specific reasons for [their] credibility findings, [their] decision is entitled to great deference and ***is supported by substantial evidence***." *Anthony*, 266 F. App'x at 460 (emphasis added).

The ALJ is not permitted to draw inferences about a plaintiff's symptoms based on "failure to seek or pursue regular medical treatment" without considering explanations such as being "unable to afford treatment" or the plaintiff "hav[ing] been advised by a medical source that there is no further, effective treatment that can be prescribed and undertaken that would benefit the individual." SSR 96-7P, 1996 WL 374186.

The record shows that the ALJ did support his credibility determination with substantial evidence. At step 4 of the disability determination, the ALJ first found that "the [plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms…." (DE 12, p. 26). The ALJ next evaluated the plaintiff's statements about the intensity, persistence, and limiting effects of her symptoms, and found a lack of credibility "to the extent they [were] inconsistent with the…RFC…." (DE 12, p. 26). The record shows that the ALJ considered the required specific factors in his credibility determination, in compliance with 20 C.F.R. § 404.1529(c): (1) "***[plaintiff] underwent back surgery on June 23, 2003 and again on June 9, 2008*** [treatment];" (2) "***[plaintiff] was seen by his primary care physician…on May***

*22, 2008…*[frequency];" (3) "***[plaintiff] returned to [Dr. Parsons] on May 28, 2008* with minor symptoms***…[intensity];" (4) "***[plaintiff] reported helping a friend work in a body shop with no adverse effect*** [daily activities];" (5) "***[plaintiff] subsequently was treated by several pain specialists…but did not receive any further orthopedic treatment except…when he asked for a referral to a pain clinic*** [measures to relieve pain or other symptoms];" (6) "***[plaintiff] testified that his left leg* [location] *is constantly* [duration] *numb and that his pain medication causes him to be forgetful and to lose his balance*** [side effects of medication];" (7) "***[plaintiff] does no lifting and performs no household chores. He noted spending time with friends and watching television. [H]e naps most days for one hour. He uses a riding mower*** [daily activities];" (8) "***[plaintiff] attempted to work as a truck driver after his back surgery, but claims his back went out while he was driving*** [precipitating and aggravating factors];" and (9) "**[plaintiff] never thought about attempting work that is less physically demanding. He did not think he could perform any job on a full time basis** [factors concerning functional limitations and restrictions]." (DE 12, pp. 25-26). Therefore, the record provides substantial evidence that the ALJ supported his credibility determination in compliance with 20 C.F.R. § 404.1529(c).

The record shows that the ALJ's decision to discount the plaintiff's testimony, giving it "significant weight" but not full credit, deserves substantial deference because the plaintiff's testimony was not consistent with uncontradicted medical evidence, because the ALJ considered the evidence, and because the ALJ gave specific reasons for his credibility determination. First, the record shows that the medical evidence was not uncontradicted. The state agency consultants found that the plaintiff "could perform light work" (DE 12, p. 26), Dr. Le's testing showed some symptomatic results but mostly normal results (DE 12, p. 26), Dr. Halford's medical source statement provided that, inter-alia, although the plaintiff "could sit for two hours out of an eight

hour day [and]… stand or walk for one hour out of an eight hour day," the plaintiff ultimately "could not be at work for eight hours." (DE 12, pp. 341-46), and Dr. Parsons' indicated that he did not think there would be a solution to the plaintiff's problem…." (DE 12, p. 337). Also, the record shows that the ALJ considered the record and found that the plaintiff's testimony was *not* consistent with the opinions of the state agency consultants because those opinions actually "fail[ed] to give adequate consideration to [the plaintiff's] symptoms and particularly to [the plaintiff's] pain." (DE 12, p. 26). The ALJ gave significant weight to the plaintiff's testimony in determining that the plaintiff was "limited to sedentary work that permits him to alternate sitting and standing every hour" but did not extend that weight to the plaintiff's testimony that he could only sit for a few minutes, could not perform any full time job, and had severe medication side effects. (DE 12, p. 26). The ALJ explained that his reasons for giving significant but not full weight to the plaintiff's testimony included the fact that the plaintiff had been released to work, despite unsuccessful attempts, that the plaintiff "had a good recovery from his last surgery," and the fact that "[t]here [was] no evidence of any subsequent injury…." (DE 12, p. 26).

The record shows that, to the extent the plaintiff argues that the ALJ inappropriately granted only significant weight to the plaintiff's testimony *solely* because of the fact that the plaintiff was released to return to work and did not seek further orthopedic treatment, this argument lacks merit. The record shows that the ALJ acknowledged that the plaintiff "made several unsuccessful attempts at working" after being released and that the ALJ considered these attempts to "have been unsuccessful work attempts." (DE 12, p. 24). However, the ALJ then went on to base his credibility determination, not on the facts about the unsuccessful return to work alone, but on the required factors under 20 C.F.R. § 416.929(c) and on the contradictions between the testimony and the record, as explained in the two preceding paragraphs.

The record shows that the ALJ found that the plaintiff's testimony was "'inconsistent with his limited medical treatment.'" (DE 12, p. 26). The ALJ could have been more explicit in explaining his use of the term "limited medical treatment," especially since the plaintiff continued to see physicians and specialists after his second surgery[17] and since the ALJ considered this treatment (DE 12, p. 26, citing exhibits 4F, 8F, 10F, 11F). However, the record shows that when the ALJ considered the plaintiff's symptoms and the plaintiff's "limited treatment" or "failure to seek or pursue regular medical treatment," the ALJ did so in compliance with SSR 96-7P guidance. The record shows that the ALJ was aware of the plaintiff's loss of insurance coverage (DE 12, p. 45) and was aware that Dr. Parsons had informed the plaintiff that there was no solution for his problem (DE 12, p. 337) when the ALJ determined the plaintiff's credibility. In other words, the ALJ considered the plaintiff's "limited treatment" but also considered the "explanations such as being 'unable to afford treatment' or the plaintiff 'hav[ing] been advised…that there [was] no further, effective treatment that can be prescribed and undertaken that would benefit the individual." SSR 96-7P, 1996 WL 374186.

Therefore, the record provides substantial evidence that the ALJ supported his credibility determination with substantial evidence, that the ALJ assessed the plaintiff's credibility by considering the evidence in the record and provided specific reasons for his determination.

---

17 The plaintiff presented to Dr. Halford to discuss weight loss on May 22 (DE 12, p. 197); he presented to Dr. Parsons with minor complaints of nerve problems in his legs on May 28, which resolved by June 26 and remained resolved through August 07 (DE 12, pp. 256-257). On February 09, 2009, an indiscernible provider indicated the plaintiff should be "off work for ten days." (DE 12, p. 250) On March 26, 2009, the plaintiff presented to Dr. Buechel with "numbness, weakness, and pain." (DE 12, p. 304). On September 03, 2009, the plaintiff presented to Dr. Parsons with numbness in his left leg and foot (DE 12, p. 337). Dr. Parsons indicated that he did think there would be a solution to the plaintiff's problem (DE 12, p. 337). On September 09, 2009, the plaintiff presented to Dr. Le, who ordered physical therapy, testing, and narcotics (DE 12, pp. 324-25). From September 16 to November 20, 2009, the plaintiff completed weekly physical therapy (DE 12, pp. 361-71). From March 25 to July 25, 2010, the plaintiff presented to Spectrum Pain Clinic under Dr. Faccia for pain management (DE 12, pp. 45, 374-432). On May 6 and June 30, 2010, the plaintiff received lumbar nerve blocks (DE 12, pp. 390, 405).

## V.        Conclusion

The record provides substantial evidence to support the Commissioner's findings of fact and the Commissioner applied the correct legal standard.

## VI.        Recommendation

For the reasons explained above, the Magistrate Judge **RECOMMENDS** that the plaintiff's motion (DE 15) be **DENIED**, and the Commissioner's decision be **AFFIRMED**.

The parties have fourteen (14) days, after being served with a copy of this Report and Recommendation (R&R) to serve and file written objections to the findings and recommendation proposed herein.  A party shall respond to the objecting party's objections to this R&R within fourteen (14) days after being served with a copy thereof. Failure to file specific objections within fourteen (14) days of receipt of this R&R may constitute a waiver of further appeal. *Thomas v. Arn*, 474 U.S. 140 *reh'g denied*, 474 U.S 1111 (1986); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004).

**ENTERED** this 8th day of August, 2013.


s/Joe B. Brown_____
Joe B. Brown
U.S. Magistrate Judge